**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**UNIVERSITY MANAGEMENT, INC.;**                                                **PLAINTIFFS**
**COLUMBUS DELI, INC.; GRILL
TUPELO, LLC; AND BBC, LLC**

**V.**                                                  **NO. 1:20-CV-138-DMB-RP**

**STATE AUTO PROPERTY AND
CASUALTY INSURANCE COMPANY**                                       **DEFENDANT**

## MEMORANDUM OPINION

The owners and operators of various restaurants and bars in Mississippi brought this breach of contract and bad faith action against their insurer following the insurer's denial of their claim for business losses allegedly resulting from statewide restaurant suspension orders issued by Mississippi's governor during the COVID-19 pandemic. The parties have filed cross-motions for summary judgment on whether the policy's food-borne illness endorsement provides coverage for the business losses. In the absence of allegations or evidence that COVID-19 was actually present at the subject premises during the suspension period or that the suspension orders resulted from actual or alleged exposure of the premises to a contagious or infectious disease, only the insurer's summary judgment motion will be granted.

**I
Procedural History**

On August 4, 2020, University Management, Inc.; Columbus Deli, Inc.; Grill Tupelo, LLC; and BBC, LLC (collectively, "UMI") filed an amended complaint[1] against State Auto Property

---

[1] The initial complaint filed July 1, 2020, named as defendants State Automobile Mutual Insurance Company and State Auto Property & Casualty Insurance Company. Doc. #1. The parties stipulated to the dismissal of State Automobile Mutual Insurance Company and to UMI amending its complaint to submit missing pages of two exhibits. Doc. #16.

and Casualty Insurance Company. Doc. #17. UMI asserts claims for breach of contract and bad faith due to State Auto's denial of insurance coverage for its loss of business income allegedly caused by COVID-19, and seeks compensatory, extra-contractual, and punitive damages. *Id.* at 6–12. State Auto answered and counterclaimed seeking a declaratory judgment that the insurance policy at issue does not provide coverage for UMI's income loss.[2] Doc. #14. Following the close of discovery, the parties filed cross-motions for summary judgment on May 27, 2021. Docs. #51, #53. The motions are fully briefed. Docs. #52, #54, #59, #61, #63, #64.

On August 31, 2021, the parties stipulated to dismiss all of UMI's claims except the claim demanding coverage under the insurance policy's "Limited Extension for Food-Borne Illness" endorsement ("Endorsement"). Doc. #86 at 1. Approximately three weeks later, State Auto filed a notice of supplemental authority alerting the Court of a Western District of Kentucky decision addressing an identical policy provision.[3] Doc. #96.

During a November 12 status conference, the Court questioned the parties regarding the then-pending appeal before the Fifth Circuit in *Terry Black's Barbecue, LLC v. State Automobile Mutual Insurance Co.*, No. 21-50078, addressing issues potentially relevant to this case. *See* Doc. #99. On January 6, 2022, State Auto filed a notice attaching as "supplemental authority relative to the pending cross motions for summary judgment" the Fifth Circuit's January 5 opinion in *Terry Black's*.[4] Docs. #103, #103-1. Following a January 12 status conference with the parties regarding the *Terry Black's* opinion,[5] the Court ordered supplemental briefing, which the parties completed

---

[2] The parties stipulated that the amendments to the complaint did not necessitate State Auto amending its answer and counterclaims. Doc. #16 at 2.

[3] *See Wild Eggs v. State Auto Property & Casualty Insurance Co.*, No. 3:20-cv-501, 2021 WL 4234940 (W.D. Ky. Sep. 16, 2021). Though State Auto submitted the supplemental authority without leave, the Court will consider it to the extent it is instructive in deciding the summary judgment issues.

[4] 22 F.4th 450 (5th Cir. 2022).

[5] Doc. #105.

2

on January 20, 2022. Docs. #107, #108, #109.

## II
## Standard

Summary judgment is proper when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party." *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014). "A court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the nonmovant. A court should enter summary judgment against a party when it has the burden of proof at trial yet fails to establish an element of its case." *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020) (internal citation omitted). "When parties file cross-motions for summary judgment, [the court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *McGlothin v. State Farm Mut. Ins. Co.*, 925 F.3d 741, 745 (5th Cir. 2019).

## III
## Factual Background

The relevant facts in this case are not disputed. State Auto issued UMI an insurance policy ("Policy") covering all UMI restaurants[6] for the period of January 1, 2020, through January 1, 2021, which was in full force and effect at all relevant times. Doc. #53-2 at PageID 1475. The Endorsement included in the Policy provides in pertinent part:

**Business Income – Limited Extension for Food-Borne Illness**

Additional Coverages **f.** Business Income and **g.** Extra Expense is amended to include coverage for the following Causes of Loss:

    1. The suspension of your "operations" at the described premises due to the order of a civil authority; or adverse public communications or media reports,

---

[6] UMI owns and operates restaurants and bars in Mississippi offering dine-in and take-out services. Doc. #17 at 3.

> resulting from the actual or alleged:
> a. Food or drink poisoning of a guest at the described premises; or
> b. Exposure of the described premises to a contagious or infectious disease.

Doc. #53-1.

"[O]n March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic, and on March 13, 2020, the President of the United States declared a nationwide state of emergency due to the coronavirus COVID-19 pandemic[.]" Doc. #51-5 at 1. In response, Mississippi Governor Tate Reeves signed two executive orders addressing the pandemic. Docs. #51-5, #51-6. Executive Order No. 1463, signed March 24, 2020, provided in pertinent part:

> [T]he worldwide outbreak of COVID-19 and the effects of its extreme risk of person-to-person transmission throughout the United States and Mississippi significantly impact the life and health of our people …; and
>
> … [T]he risk of spread of COVID-19 within Mississippi constitutes a public emergency that may result in substantial injury or harm to life, health, and property within Mississippi; and
>
> … [O]n March 11, 2020, the Mississippi State Department of Health confirmed the first presumptive case of COVID-19 in Mississippi and as of March 24, 2020, there are 320 presumptive and confirmed cases in Mississippi that have tested positive for COVID-19; …
>
> …
>
> From the date of this Executive Order until April 17, 2020, restaurants, bars, or other dining establishments shall suspend dine-in services unless able to reduce capacity to allow no more than 10 people to be gathered in a single space at the same time where individuals are in seated or otherwise in close proximity to each other. However, the use of drive-thru, carryout, or delivery options is allowed and highly encouraged.

Doc. #51-5 at 1–2. Executive Order No. 1466, signed April 1, 2020, contained additional restrictions related to COVID-19, specifically limiting restaurants and bars "to drive-thru, curbside, and/or delivery service" until April 20, 2020. Doc. #51-6.

In compliance with the Executive Orders, UMI suspended its dine-in operations. Doc. #53-

4

9 at 42, 45–46. Claiming it suffered business income losses as a result, UMI submitted a claim under the Policy to State Auto. Doc. #53-10; Doc. #53-12.

After investigating UMI's claim, State Auto denied coverage under the Policy. Doc. #53-16. State Auto determined the Endorsement only applied when there was "direct physical loss or damage to property," UMI presented "no … evidence of a complete suspension due to exposure to a contagious or infectious disease within a food-borne illness," and "the Executive Orders were not prompted by conditions, actual or alleged, at [UMI's] premises."[7] Docs. #53-16 at 9; Doc. #53-17 at 2.

## IV
## Analysis

In their cross-motions for summary judgment, the parties disagree about whether the Endorsement provides coverage for UMI's claim. UMI asserts that (1) the facts support coverage under the Endorsement's plain language, or (2) alternatively, the language of the Endorsement is ambiguous as it reasonably can be interpreted in multiple ways, and therefore must be construed in UMI's favor. Doc. #54 at 7–16. State Auto asserts that the plain language of the Endorsement is unambiguous and does not provide coverage for UMI's claim. Doc. #52 at 4–5, 19–22.

Under Mississippi law,[8] courts "appl[y] a three-tiered approach to contract interpretation." *Gainnie v. McMillin*, 138 So. 3d 131, 135 (Miss 2014).

> First, the Court applies the four corners test, looking to the language that the parties used in expressing their agreement and reading the contract as a whole, so as to give effect to all of its clauses. If the provision at issue is unclear or ambiguous, the Court applies the discretionary canons of contract construction. Finally, if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence.

---

[7] The letters to UMI denying coverage stated additional bases for denial which are not relevant here.

[8] In this diversity action, the Court applies the law of the forum state, *84 Lumber Co. v. Cont'l Cas. Co.*, 914 F.3d 329, 333 (5th Cir. 2019), which the parties do not dispute.

5

*Accident Ins. Co. v. Deep S. Roofing, Inc.*, No. 3:19-cv-10, 2021 WL 3641457, at *2 (S.D. Miss. Aug. 17, 2021) (cleaned up) (citing *Gainnie¸* 138 So. 3d at 135). "In a summary judgment case, the reviewing Court need not go through the entire three-step analysis; the Court should determine only whether the contract is ambiguous." *Id.* (quoting *Cypress Springs, L.L.C. v. Charles Donald Pulpwood, Inc.¸*161 So. 3d 1100, 1104 (Miss. Ct. App. 2015)).

Ambiguity exists in an insurance policy when the "policy can be logically interpreted in two or more ways, where one logical interpretation provides for coverage." *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1157 (Miss. 2010). "[A]mbiguities do not exist simply because two parties disagree over the interpretation of a policy." *Cont'l Cas. Co. v. Allstate Prop. & Cas. Ins. Co.*, 235 So. 3d 40, 50 (Miss. 2017). "Where the insurance policy does not provide the definition for a term or phrase, those words are afforded their ordinary and popular meaning. In determining the ordinary meaning, [the Mississippi Supreme Court] will often consult leading dictionaries." *Anglin v. Gulf Guar. Life Ins. Co.*, 956 So. 2d 853, 860 (Miss. 2007) (cleaned up).

**A. Coverage Under the Endorsement**

The Endorsement, titled "Business Income – Limited Extension for Food-Borne Illness,"[9] provides coverage for:

> The suspension of your "operations" at the described premises due to the order of a civil authority; or adverse public communications or media reports, resulting from the actual or alleged: Food or drink poisoning of a guest at the described premises; or Exposure of the described premises to a contagious or infectious disease.

Doc. #53-1 (internal labeling omitted).

This Court concludes that the Endorsement is unambiguous. Read together, the first two

---

[9] Though UMI argues the reference to "Food-Born Illness" in the Endorsement's title renders the Endorsement ambiguous, Doc. #109 at 4, it cites no authority supporting such an argument, much less binding authority holding the title of an unambiguous insurance provision may render it ambiguous.

6

phrases[10] establish suspension of operations at the described premises[11] as an event that must occur to trigger coverage. However, the use and placement of the phrases "due to" and "resulting from" after the suspension language signal additional requirements for coverage. The use of the phrase "due to," which is defined as "as a result of" or "because of,"[12] between the suspension language and the "order of civil authority, adverse public communication, or media report" language plainly conditions the suspension of operations at the described premises on the occurrence of an order, adverse public communication, or media report. However, even where operations at the covered premises are suspended due to a civil order, that order must also "result from" an actual or alleged "[e]xposure of the described premises to a contagious or infectious disease."

When used as a verb, "result" is defined as "to proceed or arise as a consequence, effect, or conclusion."[13] The "resulting from" language therefore indicates the need for a causal link between an actual or alleged exposure of the premises and the order suspending operations at the premises.[14] The Mississippi Court of Appeals has recognized that "the accepted definition of the phrase 'result of' … requires *a cause* from which an effect would follow." *Clarendon Nat'l Ins. Co. v. McAllister*, 837 So. 2d 779, 780 (Miss. Ct. App. 2003) (emphasis added).

Exposure is defined as "the fact or condition of being exposed," such as "the condition of

---

[10] Specifically, "[t]he suspension of your operations" and "at the described premises."

[11] The parties do not dispute that for the purposes of contract interpretation, the "described premises" refers to the individual restaurants listed in the description of the premises section and that they are the same "described premises" referenced in the Endorsement.

[12] *See Due To*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/due%20to (last accessed Mar. 7, 2022).

[13] *See Result*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/result (last accessed Mar. 7, 2022).

[14] This is consistent with the Fifth Circuit's decision in *Terry Black's* that, under Texas law, "[t]he plain meaning of 'resulting from' is causation." 22 F.4th at 458. In *Terry Black's*, the Fifth Circuit, interpreting a nearly identical State Auto policy provision, held that the insured's failure to allege "even a remote causal connection between the civil authority orders and [the insured's] restaurants' alleged or actual exposure to COVID-19" was fatal to its argument that coverage was appropriate. *Id*.

7

being subject to some effect or influence,"[15] like the flu. When followed by and read together with "of the described premises," the use of the word exposure indicates that the described premises itself must be affected by something—in this case, a contagious or infectious disease. Therefore, "exposure of the described premises" is reasonably interpreted to require a premises-specific exposure to a contagious or infectious disease. Considering the plain language of the Endorsement as a whole, the phrase "resulting from" requires an order suspending operations to be at least causally connected to an actual or alleged premises-specific exposure.[16]

Although disagreeing with a causation requirement, UMI argues that its premises were "allegedly, if not actually" specifically exposed to COVID-19. Doc. #54 at 8. UMI contends that various media reports and the Executive Orders suspending dine-in operations for the entire restaurant industry resulted from a general "allegation" that COVID-19 was specifically present in UMI's restaurants because COVID-19 was present throughout the entire state of Mississippi. *Id.* at 8–9. UMI relies on its expert Brandt Galloway, who testified that he "assumed" all of UMI's premises were specifically exposed to COVID-19 because "COVID[-19] was everywhere" and the media reports and Executive Orders constituted allegations of exposure under the Policy. *Id.* at 13–14. The Court is not persuaded by this argument. UMI does not allege or provide evidence of any physical spread and/or contamination of COVID-19 at any of its locations[17] nor has it

---

[15] *See Exposure*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/exposure (last accessed Mar. 3, 2022).

[16] Other courts interpreting synonymous contractual language have reached the same conclusion. *See, e.g., Isaac's Deli, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 539 F. Supp. 3d 424, 434 (E.D. Pa. 2021) (no coverage under food-borne illness extension because plaintiff did not assert that shut-down orders resulted from exposure of any of its properties to the COVID-19 virus, which was required because "[t]he phrase 'resulting from' suggests a requirement of proximate causation"); *Wild Eggs*, 2021 WL 4234940 at *6–7 (no coverage under identical food-borne illness endorsement because the phrase "exposure of" in the endorsement requires an "act or an instance of exposing" and does not include the risk of exposure).

[17] State Auto notes that when UMI representative Robert Fort was asked whether he was aware of any instances of actual exposure to COVID-19 at any of the insured premises, he testified that "[w]e are not aware of any." Doc. #53-9 at 76.

8

presented any evidence that any public reports or the Executive Orders were made due to any UMI premises-specific exposure.[18] Neither the language of the Executive Orders nor Galloway's interpretation of generalized media reports establish actual or alleged exposure of UMI's premises. The express language of the Executive Orders directly contradicts UMI's position because it addresses the suspension of in-person dining, among other activities, due to "the risk" of the spread of COVID-19, making no mention of any actual presence of COVID-19 in every location throughout Mississippi, let alone UMI's operations specifically.[19] *See* Docs. #51-5, #51-6.

UMI argues that even if "there was no actual or alleged exposure of UMI's premises to a contagious or infectious disease, coverage is still invoked because of the ambiguous nature of the [E]ndorsement," which can reasonably be read to omit any requirement that COVID-19 was actually present at UMI's premises. Doc. #54 at 14; Doc. #61 at 3–4; Doc. #64 at 7. Looking to the language of the Endorsement for support, UMI relies on the omission of the words "within" or "emanating from" to establish that the actual presence of COVID-19 on the premises is not required. Doc. #61 at 3. UMI also contends that the term "exposure" is subject to multiple meanings and that alternative definitions of exposure allow interpretation of the Endorsement as not requiring the actual presence of COVID-19 at its premises. Doc. #64 at 7–8. State Auto argues the interpretations suggested by UMI are unreasonable as "incompatible with the clear and unambiguous terms of the Endorsement" and "contrary to common sense." Doc. #59 at 1–2.

---

[18] UMI references *Sylvester & Sylvester, Inc. v. State Automobile Mutual Insurance Co.*, No. 2020 CV 817, 2021 WL 137006 (Stark Cnty. Ct. C.P. Jan. 7, 2021), as the "only case" addressing the exact same endorsement at issue in conjunction with Ohio's closure orders. Doc. #64 at 2, 4. While State Auto argues that the endorsement there provides coverage only when the policyholder's restaurant is the specific target of the closure order, the *Sylvester* court explained that the plaintiff had pled that its losses were the result of "the physical spread and/or contamination of COVID-19 at, in, on, and/or around Sylvester's premises" which was specific enough to the premises to allow the case to go forward and deny the motion for judgment on the pleadings. *Id*. at 4. UMI's reliance on *Sylvester* is misplaced because at the summary judgment stage, UMI did not create any genuine dispute as to whether UMI's premises were actually or allegedly exposed to the presence of COVID-19.

[19] The *Terry Black's* court also considered the express language of the suspension orders, finding that they indicated they were "enacted to *avoid* exposure to COVID-19, not *because of* exposure to COVID-19." 22 F.4th at 459.

UMI's argument that the omission of the words "within" or "emanating from" from the Endorsement is far from reasonable, and even if it was, because the Court has found the contract unambiguous, it may not "infer intent contrary to that emanating from the text." *Facilities, Inc. v. Rogers-Usry Chevrolet*, 908 So. 2d 107, 111 (Miss. 2005). Not only does the plain language of the Endorsement already require premises-specific exposure without these additional words but if they were part of the Endorsement, they would not alter an exposure requirement, instead potentially limiting the scope of exposures to those specifically within or emanating from the premises.[20]

Contrary to UMI's argument, the alternative definitions of "exposure" do not create an ambiguity in the Endorsement as to whether the presence of COVID-19 at UMI's premises is required. For example, one of UMI's alternate definitions of exposure is, "the state of being in a place or situation where there is no protection from something harmful or unpleasant." Doc. #64 at 7–8. The phrase "protection from something harmful or unpleasant" requires the presence of something harmful or unpleasant, otherwise protection would not be needed.

Because the Policy is unambiguous, it must be enforced and applied as written.[21] When applying the facts of this case to the Endorsement language, to provide coverage under the Policy,

---

[20] In order to conform the terms of the Endorsement to omit the premises-specific requirement, this Court would have to improperly infer that the parties intended for omitted words such as "potential" or "risk of" to modify the phrase "exposure of the described premises." Under the interpretation of the Endorsement proposed by UMI, any civil authority order resulting from the *potential* exposure of similarly situated premises or the *risk of* exposure to the described premises would be sufficient to invoke coverage. This essentially would render meaningless the "resulting from" and the "exposure of the described premises" language.

[21] UMI also argues the contract is ambiguous because everything before the semicolon following the word "authority" can be read as an independent clause standing by itself. Doc. #61 at 4–5. Because the Court determined the contract is unambiguous, it need not consider this argument. But even if it considered this alternative interpretation, it simply would not conclude that a reasonable person in UMI's position would understand that the Endorsement intended to provide coverage due to *any* order of a civil authority for *any* reason at all. *See S. Healthcare Servs., Inc. v Lloyd's of London*, 110 So.3d 735, 744 (Miss. 2013) ("The intention of the parties to the insurance contract should be determined based upon what a reasonable person placed in the insured's position would have understood the terms to mean.") (internal alterations omitted).

COVID-19 must have actually or allegedly been present at a specific UMI premises covered by the Policy, and the Executive Orders suspending UMI's operations must have resulted from that same actual or alleged premises-specific exposure. As UMI has not created any genuine dispute as to whether its premises were actually or allegedly exposed to the presence of COVID-19, summary judgment will be granted in State Auto's favor on the coverage issue.

### B. Bad Faith Claims

"An insured seeking to recover on a claim of bad faith must first establish the existence of coverage on the underlying claim." *Stubbs v. Miss. Farm Bureau Cas. Ins. Co.*, 825 So.2d 8, 13 (Miss. 2002); *see Mahli, LLC v. Admiral Ins. Co.*, No. 1:14-cv-175, 2015 WL 4915701, at *18 (S.D. Miss. Aug. 18, 2015). Having found no coverage under the Policy, UMI's bad faith claims fail as a matter of law and summary judgment in State Auto's favor must be granted on UMI's bad faith claim too.

### V
### Conclusion

State Auto's motion for summary judgment [51] is **GRANTED** and UMI's motion for summary judgment [53] is **DENIED**. All remaining motions [75][77][79][81][83][93] are **DENIED as moot**. A separate judgment will be issued.

**SO ORDERED**, this 15th day of March, 2022.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**